## AKERS *v.* MARSH.

---

EQUITY; INJUNCTIONS; NUISANCES.

In a suit by a husband and wife to enjoin certain parties from playing the game of croquet on a vacant lot opposite complainants' dwelling, upon the ground that the playing of the game at the time and place constituted a nuisance which impaired complainants' enjoyment of their home, where it appeared that the game was played after nightfall until and sometimes after 11 o'clock, P. M., light for the purpose being provided by small oil torches fastened to the wickets, to the annoyance and discomfort of the complainants, especially the female plaintiff, who, at the time, was in a delicate condition, but that it was not conducted in a boisterous or disorderly manner, nor persisted in by the defendants with a malicious motive of annoying the complainants, the only colorable ground of complaint being the noise incident to the playing of the game at night, it was *held*, reversing a decree of the lower court, that there was nothing in the case justifying the interference of the court by injunction.

No. 1116.   Submitted October 16, 1901.   Decided November 6, 1901.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia granting an injunction restraining the defendants from playing the game of croquet after nightfall.                          *Reversed.*

The COURT in its opinion stated the case as follows:

The bill in this case was filed July 19, 1900, for the purpose of obtaining an injunction to restrain the defendants from playing the game of croquet on a vacant lot near by and opposite the dwelling-house of the complainants, upon the ground, as alleged, that the playing of the game at the time and place constituted a nuisance to the complainants, whereby the enjoyment of their home was seriously impaired.

The complainants are husband and wife, and reside on Huntington place, in the city of Washington, opposite an open lot owned by one of the defendants, Mrs. Lacey, and which, with her consent, is used by Mr. Akers, the other defendant, and his family and friends, as a croquet ground. In the bill it is alleged that the game was frequently played from about nightfall until and sometimes later than 11 o'clock, P. M., light being provided from small torchlight lamps, one of which was fastened on each wicket; that these torches gave a flaming light, and emitted offensive odor and smoke. The manner in which the complainants were affected by the nuisance is charged to be, that the husband being an architect by profession, his work requires for its proper execution the full composure of his nervous system, which, by the playing of the game, has been disturbed. That the female complainant is of a naturally slight and delicate organization, and is especially sensitive to noises of every description, and she is besides in a delicate condition of health, being far advanced in pregnancy, requiring constant care and attention, and in great danger of serious consequences in the absence of such care and attention, and in the presence of distracting noises or annoyances to her senses of every description. It is alleged that the effect of the light and odor from the torches, and the noises from the game upon the female complainant is distracting and annoying, so that she is deprived of sleep and rendered nervous, while the husband, by the constant necessity he is under of giving attention to his wife in her nervous state, is also deprived of sleep, etc.

Most of the substantial allegations of the bill in respect of what is alleged as a nuisance by the playing of the game of croquet, are denied by the answer of James O. Akers, the principal defendant; the answer of the other defendant, Mrs. Lacey, while admitting that the vacant lot belongs to her and that she had given permission for its use as a croquet ground, avers that she was and is ignorant of the manner in which the complainants were affected by the playing of the game of croquet on the lot.

Upon the coming in of the answers, proof was taken in support of and in refutation of the case as stated in the bill; and, upon final hearing the court below, on the 6th day of June, 1901, decreed that the defendants and each of them and their and each of their several agents, associates, and representatives be perpetually restrained and enjoined from playing the game of croquet at the place and in the manner mentioned and described in the bill of complaint, at any hour or hours which may necessitate the use of lamps or any other form of artificial light to enable the said game to be played; and that the complainants have and recover of the defendants their costs, etc.

It is from this decree that the appeal is taken by the defendants.

In the opinion of the learned justice below a very full and clear statement of the allegations and proof is furnished, and also of the contentions of the parties; and as we agree with much of what is said in that opinion, though not with the final conclusion reached, we adopt the statement of the facts that it contains. The opinion states:

" It is alleged that the defendant Akers is a resident on the same street on which the complainants reside; that besides his family he has boarders; that the defendant Lacey is the owner of a vacant lot fifty feet in width, which is directly opposite the residence of the complainants; that the complainants' residence and this vacant lot are located on Huntington place, just west of Fourteenth street northwest; that the defendant Akers and others have graded and equipped this lot for the purpose of games of croquet; that

the land has been leveled off and rolled and sanded, and that a number of iron wickets that are essential for the proper playing of that game have been put in the proper place for such purpose upon this lot, and that the lot itself has been inclosed for the purposes of this game by running a wooden curb about it for the purpose of keeping the balls within the boundary; that during the summer of 1899, the female complainant was in a state of bad health; that she had suffered from a physical ailment to which women are subject, and, as a result of that ailment, was suffering from physical weakness and general nervous debility; that during the summer of 1899, it was the habit of Akers, and his family, boarders and others associated with them, to play this game of croquet, not only to some extent in the hours of daylight, but principally after darkness had set in, continuing the game as late as eleven o'clock and sometimes later than eleven o'clock at night; that to enable them to play this game during the hours of darkness, and to afford the requisite light for the purpose, the wickets were each provided with a vertical rod, upon which was hung a lamp supplied either with coal oil, or gasoline, or some inflammable substance which, without a chimney to confine it and keep the light steady, gave a flaring and flickering light, and, for the same reason, inasmuch as the gas or the coal oil was not entirely consumed, emitted fumes and vapors and unconsumed particles, which were offensive, and that this game, played at these unreasonable hours, continued through the summer of 1899, notwithstanding the great discomfort to the female complainant. The game, of course, was discontinued during the winter months, as the season was not favorable to such occupation, but it began again in the early summer, and when this bill was filed, somewhere about the middle of July, 1900, the parties were engaged, if not every night, several nights in the week in playing this game. At that time, the female complainant, as alleged and proved, was with child, and the day of her confinement was not remote. She was actually suffering from the inconvenience and the nervous strain which were consequent upon

such a condition. It is further alleged that she needed sleep, particularly in the hours that were ordinarily devoted to such purposes, and that the playing of this game at unreasonable hours not only deprived her of sleep at that time, but the consequent effect upon her nervous condition and upon her nerves was such that when the game itself ceased, she had become so wrought up that she was unable, frequently, to get any sleep at all until towards morning, and then, very frequently, only by the use of sedatives.

" In some way it appears that the parties who played this game were aware not only of Mrs. Marsh's condition, but also of the fact that the game so played was an annoyance to her. I say that because it appears that when Mr. Blackwood was seen he intimated as much. He was seen by the husband of Mrs. Marsh as to the particular subject of this annoyance, and he was asked to speak to Mr. Akers about it. He declined and said that he thought Mr. Marsh should have seen Mr. Akers himself. For some reason Mr. Marsh did not care to do so, and declined to do so, and the game continued. Application was made to the chief of police, and also to the Commissioners of the District of Columbia, to interpose and stop the annoyance, and the reply given was that it was beyond the power of either or any of these officials; that the only recourse was to the courts. It was then that counsel was called in and a letter was written to Mr. Akers advising him of the situation. Not only did the parties take no notice of it — of the letter, as I understand it, but they continued, notwithstanding the information that owing to this lady's condition this game was not only a serious annoyance, but operated seriously to impair her health, insisting upon it that they had certain rights in the enjoyment of this property, which had been licensed to them for the purposes of such use, that this was a reasonable use of the property, and it did not matter whether some one else was inconvenienced or not.

" Then this bill was filed. A preliminary restraining order was granted, and ultimately that restraining order was continued until the final hearing. The game was therefore

stopped during the summer of 1900. Proof has been taken on both sides. It appears by the testimony that there are several adjoining houses adjacent to this vacant lot on which the game was played on the north side of Huntington place occupied by people the most of whom are interested in the game, and many of whom played, including the Akers family, and that on the opposite side of the street and adjoining the complainants, were one or more houses the parties living in which either had or had not — I believe one person has — played occasionally. The other family has not played at all. The testimony of all of these parties is that they were not annoyed or incommoded by the playing of this game at night, or by the gas or the lights that were used for that purpose. They have never noticed any odor from the burning gasoline or coal oil. They have not only not been annoyed, but many of them found pleasure in looking out of their windows upon the game while it was in progress, and have also enjoyed themselves by walking over to the premises and sitting on benches provided for the purpose and watching the play. There seems to be an entire unanimity on the part of the neighbors that this game is not an annoyance; that it is not a nuisance. There seems to be a common neighborly sentiment between those who have testified in behalf of the defendants, easily understood, so far as it can be understood, by the fact that many of them engage in the game themselves, and those that do not have friends that do. Perhaps also it is explained on the ground that it is not the custom of these people, although I am not sure that that appears in the testimony, to retire earlier than eleven o'clock at night. Probably also on the ground that they are persons normally constituted with respect to their nervous system. The only persons who testified to the annoyance and nuisance that is consequent upon such a use of the croquet grounds after night, were the two complainants, and the mother of the female complainant, and a fourth witness, who testified that he could hear the noise of the play from an adjoining street, or he did hear it upon one occasion.

" Now, it is claimed that because this was not an annoyance to these several witnesses who have testified in behalf of the defendants and who are located upon the same street and, to a certain extent, under the same conditions as to location as those under which the complainants live, it cannot be such a nuisance as would afford to the complainants a legitimate reason for complaint. Such an annoyance, it is claimed, does not afford the complainants or either of them a right to an action at law, for the injury would be so slight as to be unappreciable, and that if not entitled to an action at law they certainly are not entitled to an injunction to restrain the act.

" There can be no question that the game that has been described in the testimony is an innocent pastime, and that the exercise of such game, if it may be called such, is healthful and enjoyable, and parties are to be commended for making use of such outdoor exercise for the purpose of recreation under ordinary conditions. I think the testimony also shows that while this game was accompanied, very naturally, by exclamations of pleasure or disappointment at particular shots, or of laughter or applause perhaps, at the time, over some particular feature of the game, yet it has not been conducted in a boisterous manner. It is, however, claimed that the conduct of the game at these hours of the night, with the noise that necessarily accompanied the knocking of the balls together and striking of the balls by the mallets, and the striking of the balls against the curb, and the conversation and laughter, and the noise that naturally accompanied the playing of such a game, was not only an annoyance to the complainants, but such an annoyance as the court should prevent by injunction.

" Of course, what is a nuisance and what is not a nuisance is a question very largely of locality; a question very largely of the character of the neighborhood in which the nuisance is alleged to have existed, and the purposes for which the neighborhood is used. What would be a nuisance in one locality would not be a nuisance in another locality. There can be no question that the playing of this game in a place

that was not so near to a dwelling, or to a number of dwellings in a residence neighborhood, as to interfere with the rest of the denizens of that neighborhood, would not be a nuisance. The question, however, as to what constitutes a nuisance is, as stated, very largely a matter of locality, and the peculiar purposes to which the neighborhood is subjected, and for which it is used, and where the nuisance is located. In a residence neighborhood certain things would be a nuisance that in another neighborhood would be no nuisance. The books are full of such cases, and it would be supererogation and a useless expenditure of time to attempt to give a list of the cases that are dependent upon their peculiar circumstances.

" The question appears to be whether the occupation that is complained of as a nuisance is a reasonable occupation under all the circumstances. The playing of this game of croquet under these conditions during the hours of daylight or in the early hours of the evening, I think, could not be successfully claimed to be a nuisance. I do not think it is contended in the argument of the case that a game so played would be a nuisance, except in so far as the inconvenience afforded by these flickering lamps and by the odors that are claimed to emanate from them might be a nuisance; but the feature of the game which is strenuously objected to is the time in which the game is conducted — that is, in some of the hours ordinarily devoted to sleep, not only because of the noise, but also because of the inconvenience that is suffered by reason of the flickering glare of the lamps and from the smoke that emanates from them.

" The testimony, I think, does not sustain the claim of the complainants that sufficient smoke emanates from those lamps to constitute a nuisance. The most that is claimed for them is that the smoke was perceptible at times on the front steps. Of course that cannot be when the wind is in the opposite direction; it necessarily carries it away from the house, and that would only be occasional, and it would be so slight that it does not appear to me that the court could take any notice of it. It would be such a slight incon-

venience as not to justify any judicial interference or to offer any reasonable claim that the smoke was a nuisance.

"It does appear to me, however, that the glare — the flickering glare from these lamps located upon this lot directly opposite to the complainants' house — must necessarily have some effect upon the comfort of the residents in that house. It is very true that some persons would not mind such lights. The eyes of many people are, however, so constituted that they cannot stand such a peculiar light. Some persons sitting in this courtroom cannot face the window without great suffering; others can face it and not mind it at all. It is true that the question is not whether an abnormally constituted individual would be inconvenienced, but whether the ordinary person would be subjected to inconvenience by the alleged nuisance. While the question of these lamps would not be a matter of very great moment, disassociated from the other element of nuisance, yet it does not appear to me to be at all unreasonable that it would be a matter of considerable inconvenience; that it can incommode the occupants of that house, and particularly so in the summer time when the windows are all open, the blinds are all open for the purpose of admitting air, and in the time ordinarily devoted to sleep such a light in the room would be a serious inconvenience, and to a great number of people would be a detriment to sleep.

"Now, with reference to the noise from this game of croquet, while, as I have said, those noises are, perhaps, only those that are incident to such a game played in the ordinary way and by ordinarily careful people, yet, played at the hours that are ordinarily devoted to rest, the noise that proceeds from such a game would not only destroy sleep, but throw the persons who are thus deprived of sleep into a nervous condition, which would likely, after the noise ceased, prevent repose for some time after.

"Now, it is said that Mrs. Marsh is an abnormal woman; that she is naturally nervously constituted, and that in her physical condition she was perhaps more nervous than she would have been otherwise; that she was captious and com-

plaining, and that that was her disposition. That was the effect of the testimony taken by the defendants. The testimony of Mrs. Marsh, however, appears to be that of an intelligent woman, showing no rancor or spite towards the people that are thus annoying her, testifying in a very calm and commendable manner of a matter that has evidently been a great source of trouble to her, showing that while she was at the time, the last year, in the summer, under the circumstances, in a nervous condition, yet she says she was not more nervous when she got her rest than people ordinarily are; that when she had a good night's rest she felt in a cheerful frame of mind the next day, and therefore it seems to me to be clear that the reason that she was annoyed was not merely ·because she was of a nervous constitution, but that these noises would actually annoy many other people.   *    *    *

" But there seems to have been, for some reason, an unneighborly feeling on the part of both complainants and defendants, and perhaps the trouble largely arose out of that fact. The defendants, through their witnesses, have testified that the complainants held themselves aloof; that they did not associate with their neighbors. While that complaint might be a reasonable one in a country village, in a city like Washington, where next-door neighbors live by the side of each other for years and never enter each other's houses, it is not a very reasonable complaint. I think largely this question has arisen out of the fact that there is no social intercourse between the parties, and there is a feeling of soreness consequent upon it.

" The question, it seems to me, is, in the first place, were these noises the ordinary noises that were to be expected by the complainants in that locality, considering its situation, the purposes for which it was used, and the fact that it was a residence locality, and that exclusively. So far as the playing of that game during the day is concerned, I should say that it was such a noise as might be expected. Parties have the right to enjoy themselves by playing a game of croquet, or any other legitimate amusement that they might

engage in, but after the time that is ordinarily devoted to sleep has commenced, it seems to me that such noises are not the noises that may be ordinarily expected. They are not ordinarily such noises — they are not the noises that ordinarily emanate from the usual and customary use of dwellings.

" Now, was this use to which this vacant lot was subjected a reasonable or unreasonable use, under all the circumstances? I have no hesitation in saying that to me it appears to be entirely unreasonable, considering the time the game was played and the late hour at which it was carried on."

Mr. A. A. Birney and Mr. H. F. Woodard for the appellants:

1. The proposition of the complainants is that the peculiarly supersensitive and abnormal condition of the complainant made that a nuisance as to her, which, as to persons of ordinary sensibilities similarly situated, was innocent, and that because she was injuriously affected she is entitled to an injunction. This is the claim as made by the bill and as developed in the proofs. The converse of this proposition is the rule. Dittman v. Repp, 50 Md. 516. See also Adams v. Michael, 38 Md. 123; Powell v. Bentley, &c., Co. (W. Va.), 12 L. R. A. 53; Rogers v. Elliott, 146 Mass. 349; Price v. Crantz, 118 Pa. St. 402; Wood on Nuisances, 473; McCann v. Strang, 97 Wis. 551; Beckley v. Skroh, 19 Mo. App. 75; Westcott v. Middleton, 43 N. J. Eq. 478; Fay v. Whitman, 100 Mass. 76–78; 3 Pomeroy's Eq., Sec. 1350; Germaine v. London Exhibition, 75 L. T. Rep. 101; Crump v. Lambert, L. R., 3 Eq. 409; Wood on Nuisances, 431, 488–489.

2. Where the thing complained of is not per se a nuisance, but may prove so according to circumstances,. the court of equity will generally refuse to interfere until the matter has been tried at law. Rouse v. Martin, 51 Am. Rep. 463 and cases cited; Webb's Pollock on Torts, 5211, note.

3. The claim for injunction made by the bill was based on the delicate condition of health of Mrs. Marsh due to her

pregnancy; this condition had long passed at the time of the decree, and yet *a permanent injunction* was granted as if that condition were permanent. It is submitted that this was palpable error.

*Mr. Henry E. Davis* and *Mr. Charles Cowles Tucker* for the appellees:

1. Anything offensive to the sight, smell, or hearing, erected or carried on in a public place where the people dwell or pass, or have a right to pass, to their annoyance, is a nuisance at common law. Whatever is injurious to the health, or indecent, or offensive to the senses, or an obstruction to the free use of property, or an essential interference with the comfortable enjoyment of life or property is a nuisance. *Hackney* v. *State,* 8 Ind. 494; *Walter* v. *Selfe,* 4 Eng. L. & Eq. 20; *Soltan* v. *De Held,* 9 Eng. L. & Eq. 102–104; *Crump* v. *Lambert,* 3 L. R. (Eq. Cas.) 407–409; *Coker* v. *Birge,* 9 Ga. 425; *Howard* v. *Lee,* 3 Sandf. (N. Y.) 281; *Catlin* v. *Valentine,* 9 Paige Ch. 574; *Dennis* v. *Eckhardt,* 3 Grant Cas. (Pa.) 390; Adams Eq. 210. A use of premises that, by reason of its peculiar results, renders the enjoyment of life uncomfortable, is a nuisance, although it produces no visibly injurious effects upon property of any kind, such as noise or vapors or unpleasant (not necessary noxious) smells that render life uncomfortable and interfere with its enjoyment. *Ibid.; McKeon* v. *See,* 4 Robt. (N. Y.) 449; 51 N. Y. 300; *S. C.,* 10 Am. Rep. 659; *Rex* v. *White,* 1 Burr. 337; *Cleveland* v. *Gas Light Co.,* 20 N. J. 201; Wood on Nuisances (1st ed.), Sec. 3, and cases. A lawful business may thus be a nuisance. *Walter* v. *Selfe, ubi supra; Ross* v. *Butler,* 4 C. E. Green (N. J.), 294; *Attorney-General* v. *Steward,* 5 N. J. 415; *Pickard* v. *Collins,* 23 Barb. 444; *Dennis* v. *Eckhardt, ubi supra.* Nuisances may be public or private or both. A public nuisance will be restrained at the suit of a private person who suffers a special injury thereby, and in case of a mixed nuisance those living or owning property in the neighborhood may

have their private action. Wood, Secs. 535–540, 642–647 and 674, n. 2, pp. 577–579; *Hamilton* v. *Whitridge,* 11 Md. 128; *Wesson* v. *Washburn Iron Works,* 13 Allen, 95; *Francis* v. *Schoellkopf,* 53 N. Y. 52. And several may join in a suit for the purpose. *Brady* v. *Weeks,* 3 Barb. 157; *Peck* v. *Elder,* 3 Sandf. 126; *Murray* v. *Hay,* 1 Barb. 147; Wood, p. 579; Story Eq. Pl., Sec. 286 B and note, 539 and note.

2. The jurisdiction of equity in cases of nuisance is clearly established and has been so from an early day. Equity will interfere wherever there is an injury to a right as distinguished from property or to a right incident to property, in respect of which no correct estimate of damage can ever be made; and in the case of noises, smells, and other offenses to the senses, in which cases it is impossible to show actual pecuniary damages. Interference with the common right to pure air is such an injury to a substantial right as to call for the aid of equity, and that aid will be extended in all cases of irreparable injury, or wherever it is necessary to prevent oppressive and interminable litigation, or where the injury is such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance. And irreparable injury in this connection means only such injury for which no fair or reasonable redress can be had in a court of law. Nor is it at all necessary that the question of nuisance be first tried at law. 2 Story Eq., 924; Wood, Sec. 769, n. 1 and cases; *Carlisle* v. *Cooper,* 21 N. J. Eq. 582; *Duncan* v. *Hayes,* 22 N. J. Eq. 25; *Hack Imp. Co.* v. *Railroad Co.,* 22 N. J. Eq. 94; *Crump* v. *Lambert, ubi supra; Cleveland* v. *Citizens' Co.,* 5 C. E. Green, 201; *Francis* v. *Schoellkopf,* 53 N. Y. 156; *Corning* v. *Troy Co.,* 40 N. Y. 191; *Ross* v. *Butler,* 19 N. J. Eq. 294; *Saville* v. *Killner,* 26 Law Times (N. S.), 277; *Woodyear* v. *Schaefer,* 57 Md. 1; Wood, Sec. 770 and cases, and n. 4, p. 819; *Clowes* v. *N. Staffordshire Co.,* L. R., 8 Ch. App. 125; Opinion of Mellish, J.; Wood, p. 817; *Webb* v. *Portland,* 3 Sumn. 189; *Hass* v. *Co.,* 14 N. J. Eq. 335; *Pike Co.* v. *Plank Road Co.,* 11 Ga. 246; *Inchbald* v. *Robinson,*

L. R., 4 Ch. App. 388; *Inchbald* v. *Barrington,* L. R., 4 Ch. App. 388; *Wesson* v. *Sanborn,* 45 N. H. 169, 171; *Carlisle* v. *Cooper,* 18 N. J. Eq. 247. And see, generally, Wood, Secs. 474, 772, 774, 799, 801.

3. It is now well settled that *noise alone* may create a nuisance and be the subject of an action at law for damages, in equity for an injunction, or of an indictment as a public offense. Wood, Sec. 542, and cases; *Dittman* v. *Repp,* 50 Md. 516, 523; Wood, Sec. 548, and cases; *Dittman* v. *Repp,* 50 Md. 516, 521, 522. *Smells alone* may create a nuisance if they render the occupation of property physically uncomfortable to a person of ordinary sensibilities, no matter to what purpose the owner may choose to devote such property. Wood, Sec. 431, and cases.

4. The following trades, uses, and occupations, among others, have, under the circumstance of each case, been adjudged nuisances: A tobacco mill, a blacksmith shop, a dwelling-house negligently kept, a soap boilery, a livery stable, a private stable, varnish-making, screening coal in a public place, a pig-pen near a public road, and depositing manure near a dwelling. Wood, Sec. 530, and notes. The authorities cited for the appellants deal with the general principles of the law of nuisances, and are not really pertinent to the particular contention set up for the appellants. The law was most reasonably and intelligently stated by the St. Louis Court of Appeals, speaking by Seymour D. Thompson, justice, in the case of *Leete et al.* v. *Pilgrim Congregational Society,* 14 Mo. App. 590, in which case the complaint was of the ringing of certain church bells.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The appellants upon this appeal have assigned four grounds of error in the decree appealed from, viz.:

1. In holding that the acts charged and proven constitute a nuisance.

2. In holding that proof of annoyance and discomfort to the complainants, or either of them, warranted an injunc-

tion, it not appearing that the acts complained of did or would disturb or discomfort persons normally constituted.

3. In granting an injunction as prayed; and,

4. In not dismissing the bill.

1. In cases of this character questions of great importance, as well as of great delicacy, are nearly always involved; the question being within what limit or under what restriction a party complaining can rightfully insist that his neighbor shall use or enjoy his property. The maxim is an old one, and one which is founded in the necessity of property rights and the good order of society, which declares that every person must enjoy his own property in such a manner as not to injure that of another person. This, however, is but the formulation of a general principle. A party must enjoy his own property in such manner as not to involve the *legal rights* of his neighbor as defined by law. But, in the relations of communities of people, mere matters of inconvenience or ordinary discomforts, such as are ordinarily incident to social life, must be endured, and cannot be made the subjects of judicial cognizance. There are always certain inconveniences and annoyances that must be suffered, and owing to the different temperaments and nervous constitutions of people, some suffer more than others. But the law does not make an exception to meet the cases of pronounced idiosyncrasies or states of peculiar infirm health of people. If every instance of annoyance, resulting from noise, smoke or odor, proceeding from a neighbor's premises, or light flickering in or glaring from a neighbor's windows, to the discomfort of a party living near by, could be made the ground for judicial interference, without reference to the special circumstances of the case, and the degree of annoyance or discomfort suffered, the courts would be filled with such litigation, and a large portion of the inhabitants, especially of cities, would be constantly engaged in litigious strife. The law, however, does not encourage such litigation. It is only for the invasion of the legal rights of the complainant that the court will interfere; and no right of action either at law or in equity can be supported against a

party *for the reasonable use* of his property or the *reasonable exercise of his rights over the same,* although such rights be enjoyed or exercised in a manner that may occasion annoyance or inconvenience to another. The books abound with illustrations of this general principle.

As we have said, the application to the courts for relief by injunction in such cases can only be maintained for a plain and substantial invasion of the legal rights of the complainant; or, as said by the vice-chancellor in *Soltan* v. *De Held,* 2 Sim. (N. S.) 151, equity will only interfere in cases of nuisances where the thing complained of is a nuisance at law; that there is no such thing as an equitable nuisance. And the complainant, before he can ask for relief by injunction, must prove that he has sustained such a substantial injury, by the acts of the defendant, as would have entitled him to a verdict in an action at law. *Elmhirst* v. *Spencer,* 2 Mac. & G. 45; *Parker* v. *Lake Cotton Co.,* 2 Black (U. S.), 545, 551, 552. And there are many cases of private nuisance which will sustain an action at law, but which will not justify relief in equity. 2 Sto. Eq., Sec. 925; *Attorney-General* v. *Nichol,* 16 Ves. 338; *Corporation of New York* v. *Mapes,* 6 Johns. Ch. 46; *Railroad Co.* v. *Artcher,* 6 Paige, 83. But a court of equity will interfere when the injury by the wrongful act of the adverse party will be irreparable, as where the loss of health, the loss of trade, the destruction of the means of subsistence, or the ruin of property must ensue. 2 Sto. Eq., Sec. 925; *Parker* v. *Lake Cotton Co., supra.* And the rule is now established, at least by a decided preponderance of judicial authority, that even though the damage is small, indeed merely nominal, yet if the injury is of a *continuous* nature, so as to operate as a constantly recurring grievance, the court will restrain it, to avoid a multiplicity of actions. *Wood* v. *Sutcliffe,* 8 Eng. L. & Eq. 217; *Parker* v. *Lake Cotton Co., supra; Elmhirst* v. *Spencer,* 2 Mac. & G. 46; *Corning* v. *Troy Iron Factory,* 40 N. Y. 191. But, if the damage is small, and the injury only *occasional,* rather than a probable and necessary consequence, an injunction will be denied.

*Wood* v. *Sutcliffe, supra; Parker* v. *Lake Cotton Co., supra,* 2 Sto. Eq., Sec. 925.

The subject-matter of nuisances are various; and no particular combination of sources of annoyance is, by the law, deemed essential to constitute a nuisance; nor are the possible sources exhaustively defined by any rule of law, applied either by the courts of law or equity. Hence " smoke, unaccompanied with noise or noxious vapor, noise alone, offensive vapors alone, although not injurious to health, may severally constitute a nuisance to the owner of adjoining or neighboring property." *Crump* v. *Lambert,* 3 Eq. Cas. 412. So the persistent and unnecessary ringing and tolling of large bells; the loud music, shouting, and other noises attending the performance of a circus, the collection of a crowd of disorderly people by a noisy entertainment of music and fireworks, to the grave annoyance of persons dwelling in the neighborhood, have all been held to be nuisances and restrained by the authority of the court of equity. *Soltan* v. *De Held,* 2 Sim. (N. S.) 133; *Inchbald* v. *Barrington,* 4 Ch. App. 388; *Walker* v. *Brewster,* 5 Eq. Cas. 24; Pollock on Torts, 334.

Of course, when a party comes into a court of equity to be relieved of an alleged nuisance, such as is alleged in this case, there are two things to be considered: First, the right of the defendants against whom the complaint is made; and second, the rights of the party complaining. The *onus* of proof is upon the party complainant.

Where the ground of complaint is such as is stated in the bill in this case, that of an alleged nuisance created by noise, smoke, odor, and light, by which the complainants are annoyed, the question is one of degree as well as of locality. And the question in all such cases is, ought the alleged inconvenience and annoyance to be considered in fact, as anything more than fanciful, or as matter of mere delicacy or fastidiousness; or as an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant or dainty modes and habits of living, but according to plain and simple notions that prevail with and among the respectable and substantial people.

*Soltan* v. *De Held, supra;* *Walter* v. *Selfe,* 4 De G. & Sm. 315. Or, as the question is stated in the American cases, whether the nuisance complained of will, or does, produce such a condition of things as, in the judgment of reasonable men, is naturally productive of physical discomfort to persons of ordinary sensibilities, and of ordinary tastes and habits, and as, in view of the circumstances of the case, is unreasonable and in derogation of the rights of the complainant. *Dittman* v. *Repp,* 50 Md. 516; *Rogers* v. *Elliott,* 146 Mass. 349; Wood Nuis., Sec. 568, p. 599, and cases cited.

Now, we entirely agree with the learned justice below in his finding upon the evidence, " that there can be no question that the game that has been described in the testimony is an innocent pastime, and that the exercise of such game, if it may be called such, is healthful and enjoyable, and parties are to be commended for making use of such outdoor exercise for the purpose of recreation under ordinary conditions." It is also found to be established by the proof, that the game was not conducted in a disorderly or in a boisterous manner, or with any more noise than usually attends the playing of the game. It must, therefore, be conceded that the game was a lawful one, and innocent in itself, unless there was something connected with the playing of it that made it unlawful as it affected the complainants. The only things that are relied on as making it unlawful are the usual noise incident to the playing the game, the time and place when and where played, and the light and smoke emitted from the small lamps hung upon the wickets. That the female complainant was affected, by some, at least, of the causes of discomfort alleged, would seem to be shown beyond doubt. But her husband would seem to have been affected by the playing of the game only by reason of his careful attention to his wife, while she was in her nervous and excited condition. Other people having their dwellings in the immediate neighborhood, and within sight and hearing of the playground, were not affected or in any manner incommoded by the game. The proof shows very plainly that the female plaintiff was in a peculiar condition of health, and

that her nervous system was very much affected, so much so that she was rendered very sensitive, and was very susceptible of strong and emotional impressions made by all kinds of petty annoyances. Her condition was certainly unfortunate, and entitled her to the kind consideration of her neighbors. But we find nothing in the evidence to justify the conclusion that the parties complained of wilfully persisted in playing the game with a malicious motive of annoying the complainants. In the absence of such evidence we think there is no sufficient ground shown for an injunction. The rights of property to which the defendants are entitled must be respected, and their rights of enjoyment cannot be restricted because of the unfortunate nervous condition of one of many persons dwelling in the immediate vicinity of the property. The court below very properly concluded that the proof did not sustain the claim of the complainants that sufficient smoke emanated from the lamps on the wickets to constitute a nuisance. And we may say the same in regard to the light emanating from those lamps. The light was not of a character to constitute a nuisance that would seriously and materially affect the comfort of people of ordinary nerves and sensibility, any more than would the lights from the street lamps near the dwelling, or the lights glaring from a neighbor's windows. The only colorable ground of complaint was the noise incident to the playing the game of croquet at night or after nightfall. But we think that furnished no substantial ground for restraining the parties from enjoying their occasional recreation, by playing the game of croquet on the vacant lot during the warm weather.

In the case of *Gaunt* v. *Fynney,* L. R., 8 Ch. App. 8, the facts, in many respects, were quite analogous to those in the present case, and the principle involved was the same. In that case the bill was filed by the owners (two ladies), of a house for the purpose of obtaining an injunction to restrain the owners of adjoining buildings from causing a nuisance by noise and vibration, and from trespassing by encroachment, and from an obstruction of light, and for

the purpose of obtaining damages. The Master of the Rolls refused to grant an injunction, but made a decree for an inquiry as to damages. Both parties appealed.

In the opinion of the Court of Appeal, delivered by Lord Chancellor Selborne, the question as to what amount or degree of annoyance produced by noise, which will induce the court to interfere between owners of adjoining premises, was discussed and defined, and the nature and value of evidence in such cases was fully considered. The decree below was reversed and the bill dismissed.

In the course of the opinion, the Chancellor said: " There may, of course, be such a thing as a legal nuisance from noise in populous towns, of which the case of *Soltan* v. *De Held* is an example. But a nuisance of this kind is much more difficult to prove than when the injury complained of is the demonstrable effect of a visible or tangible cause, as when waters are fouled by sewage, or when the fumes of mineral acids pass from the chimneys of factories or other works over land or houses producing deleterious physical changes which science can trace and explain. A nuisance by noise (supposing malice to be out of the question) is emphatically a question of degree. If my neighbor builds a house against a party wall, next to my own, and I hear through the wall more than is agreeable to me of the sounds from his nursery or his music-room, it does not follow (even if I am nervously sensitive or in infirm health) that I can bring an action or obtain an injunction. Such things, to offend against the law, must be done in a manner which, beyond fair controversy, ought to be regarded as exceptional and unreasonable."

In another part of the opinion, the learned Chancellor, in speaking of the influence of certain dominating thoughts or expectations, in producing and exaggerating annoyances, especially in regard to hearing, said: " Mr. Fry made, in a part of his argument, a happy use of a passage in a recent work upon mental science (Tuke, on the Influence of the Mind on the Body, p. 47), which, treating of the influence of the mind upon the sense of hearing, says ' that the

thought uppermost in the mind, the predominant idea or expectation, makes a real sensation from without assume a different character.' Every one must have had some experience of the truth of this statement; a nervous, or an anxious or prepossessed listener hears sounds which would otherwise have passed unnoticed, and magnifies and exaggerates into some new significance, originating within himself, sounds which at other times would have been passively heard and not regarded." The Chancellor then proceeds to say that he had no doubt that the noise and sounds complained of were heard by the complainants, but that they did not constitute a nuisance to justify the court in interfering by injunction, or even in awarding damages.

We have carefully examined this case, and while fully appreciating the importance of it, not only to the parties concerned, but to the general public to be affected by the precedent, we do not find in the case anything that justifies the interference of the court by injunction; and we therefore reverse the decree below and direct the bill to be dismissed; and it is so ordered.

*Decree reversed and bill ordered to be dismissed.*