**Adam ORTBERG and Michael Weber, Appellants,**

v.

**GOLDMAN SACHS GROUP, et al., Appellees.**

**Nos. 11–CV–125, 11–CV–440.**

District of Columbia Court of Appeals.

Argued Oct. 3, 2012.

Decided April 11, 2013.

Jeffrey L. Light, Washington, for appellants.

Christopher T. Handman, with whom Douglas S. Crosno, Washington, was on the brief, for appellees.

Arthur B. Spitzer, with whom Mark L. Goldstone, Washington, was on the brief, for The Metropolitan Washington Council, AFL–CIO, The American Civil Liberties Union of the Nation's Capital, and The National Lawyers Guild, D.C. Chapter, amicus curiae, in support of appellants.

Before BLACKBURNE–RIGSBY and McLEESE, Associate Judges, and REID, Senior Judge.

REID, Senior Judge:

This case arises out of a series of protests held by Adam Ortberg, Michael Weber, and others at the District of Columbia offices of Goldman Sachs and the District of Columbia home of a Goldman Sachs' employee, Michael Paese. On January 11, 2011, after a hearing in Superior Court, Goldman Sachs and Mr. Paese obtained a preliminary injunction restricting the protests.[1] Mr. Ortberg and Mr. Weber now appeal the grant of that injunction and its scope. On this record, and for the reasons set forth below, we are constrained to reverse the trial court's grant of a preliminary injunction.

### FACTUAL SUMMARY

Beginning in late August 2010, protestors appeared on a regular basis outside the building that housed Goldman Sachs' District of Columbia office. The demonstrators were affiliated with a group called Defenders of Animal Rights Today and Tomorrow ("DARTT"), a defendant in this case. The protest called attention to Goldman Sachs' business dealings with an investment group (Fortress) that did business with a third company: Huntingdon Life Sciences ("HLS"). HLS and the companies that do business with it have been targeted by animal-rights activists in the United States and Europe. These activists have engaged in lengthy protest campaigns, which have occasionally included harassment and violence. After demonstrations at Goldman Sachs' office began, the protestors also appeared outside the home of Mr. Paese, a Managing Director at Goldman Sachs. In all, the demonstrators held thirteen protests, eight at Goldman Sachs and five at Mr. Paese's residence, between August and October 2010.

Generally, the protests followed a pattern. A group of demonstrators, usually between four and six in number, would arrive with bullhorns, airhorns, and posters. They would begin chanting slogans or making speeches accusing Goldman Sachs, and later Mr. Paese, of complicity in the deaths of animals. These chants and speeches were often amplified through the use of a bullhorn. Occasionally, according to Goldman Sachs, the protestors would enter the lobby of the building that contained Goldman Sachs' office and use their bullhorns or airhorns there. The shouting and the chanting usually lasted for roughly 30 minutes, at which point the protestors would move on. At Mr. Paese's home, and at Goldman Sachs' office, the protestors identified Mr. Paese by name and chanted a slogan that included the phrase "we know where you sleep at

---

1. The trial court modified the preliminary injunction on June 1, 2011.

night.". Following a tense encounter between neighbors and protestors outside of Mr. Paese's home on the night of October 31, 2010, Goldman Sachs and Mr. Paese filed a complaint against Mr. Ortberg, Mr. Weber, DARTT, and others, alleging claims for private nuisance, intentional infliction of emotional distress, negligent infliction of emotional distress and conspiracy. The plaintiffs also sought a temporary restraining order and a preliminary injunction.

On December 10, 2010, the parties appeared in the trial court for a hearing on a preliminary injunction. After hearing testimony from Mr. Paese, Mr. Ortberg and Mr. Weber, the court determined that the plaintiffs were likely to succeed on their claims of private nuisance and conspiracy, and that Mr. Paese was likely to succeed on his claim of intentional infliction of emotional distress. The court then issued a preliminary injunction, and Mr. Ortberg and Mr. Weber appealed.

## ANALYSIS

■ We begin our analysis with the trial court's decision to grant the preliminary injunction. Mr. Ortberg and Mr. Weber's main argument is that the trial court abused its discretion when it concluded that Goldman Sachs and Mr. Paese were likely to succeed on the merits of their claims for intentional infliction of emotional distress and private nuisance.[2] The decision to grant or deny a preliminary injunction is a discretionary one. *Feaster v. Vance*, 832 A.2d 1277, 1287 (D.C.2003). To grant an injunction, the trial court must find, among other things, that "the moving party has clearly demonstrated" a "substantial likelihood" of suc-

cess on the merits. *Id.* at 1287 (quotation marks and citation omitted).

■ We review a trial court's decision to grant a preliminary injunction "not to resolve the merits of the underlying dispute between the litigants, except insofar as the action of the trial court turns on a question of law or statutory interpretation." *Id.* at 1288 (internal quotation marks and citation omitted). Therefore, "our role is confined to (1) examining the trial court's findings and conclusions to see if they are sufficiently supported by the record; (2) assuring that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction; and (3) inquiring into any other claims of an abuse of discretion by the trial court." *Id.* (internal quotation marks and citations omitted). When reviewing challenges to a trial court's determination that a party is likely to succeed on the merits, we have said that "[a] party seeking temporary equitable relief need not show a mathematical probability of success on the merits.... Nevertheless, if the appellees' claims are barred by law, we must reach the merits of the decision" on appeal. *In re Estate of Reilly*, 933 A.2d 830, 837 (D.C.2007) (internal quotation marks and citations omitted).

### Substantial Likelihood of Success on Mr. Paese's Intentional Infliction of Emotional Distress Claim

Mr. Ortberg and Mr. Weber argue that the trial court erred when it concluded Mr. Paese would be able to prove that the defendants' conduct was "extreme and outrageous" and that Mr. Paese had "suffer[ed] severe emotional distress." For the reasons set forth below, we hold that on this record Mr. Paese has not "clearly

2. Should the plaintiffs be unable to demonstrate a likelihood of success on these claims, they would not be able to demonstrate suc-

cess on their conspiracy claim, which requires an underlying tort.

demonstrated" a "substantial likelihood" of success on the merits of his intentional infliction of emotional distress claim. *Feaster, supra,* 832 A.2d at 1287. Hence, the trial court should not have granted Mr. Paese's motion with respect to that claim.

At the hearing on the preliminary injunction, the trial court ruled that "to the extent that the conduct [of the defendants] is outrageous, over the top, extreme, beyond the bounds of decency ... the [c]ourt finds that on balance Mr. Paese would prevail." The court did not explain what it meant by the language "to the extent that," and did not explicitly indicate what specific action it considered to be "extreme and outrageous." However, the trial court also made clear that it regarded the protestors' chant "we know where you sleep at night" to be a threat of "future injury or disturbance." In addition, the trial court did not make a specific ruling regarding the severity of Mr. Paese's distress, noting only that "the [c]ourt heard from Mr. Paese regarding his emotional distress." Mr. Paese had explained in his testimony and a written declaration that he felt "afraid" that the protests would lead to violence and that he found the protests "humiliating, embarrassing and intimidating." Mr. Paese also recounted that his family felt "targeted and terrorized in our own home because of the actions of these people."

In order to prove the tort of intentional infliction of emotional distress, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Baltimore v. District of Columbia,* 10 A.3d 1141, 1155 (D.C.2011) (internal quotation marks and citations omitted). Our case law establishes strict tests for the elements of intentional infliction of emotional distress. *Bernstein v.*

*Fernandez,* 649 A.2d 1064, 1075 n. 17 (D.C. 1991). "Liability will only be imposed for conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998); *accord Wood v. Neuman,* 979 A.2d 64, 77 (D.C. 2009). In order to establish "extreme and outrageous conduct," a plaintiff must show that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d). Further, "in determining whether the conduct complained of is 'extreme and outrageous,' the court must consider 'the specific context in which the conduct took place.'" *Estate of Underwood v. National Credit Union Admin.,* 665 A.2d 621, 641 (D.C.1995) (citation omitted). When evaluating "context," a court should examine "not only ... the nature of the activity at issue but also ... the relationship between the parties, and the particular environment in which the conduct took place." *Id.* (internal quotation marks and citation omitted). In any context, no liability can be "imposed for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Homan, supra,* 711 A.2d at 818 (internal citations omitted). As a result, "[t]he requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994).

When viewed in context, the conduct in this case was not extreme and outrageous. The parties had no relationship before the protests began. The conduct took place on public streets, and consisted mostly of chanting slogans and some vague threats. In general, the conduct complained of is part and parcel "of the

frictions and irritations and clashing of temperaments incident to participation in a community life," especially life in a society that recognizes a right to public political protest. *Homan, supra,* 711 A.2d at 818 (internal quotation marks and citation omitted). While serious threats would be grounds for the imposition of liability, the oblique threats of "future injury or disturbance" in this case do not rise to that level. *See id.* at 820 (liability imposed where defendant had reason to believe plaintiff's life would be threatened, and it was).

In addition, the record shows that Mr. Paese was only disturbed on a few occasions over a period that spanned several weeks. As we have said before, "[i]n some, indeed most, instances, a few unwelcome visits," accompanied by "some harassing" conduct, "would not be cognizable in an action for a tort which requires proof of extreme or outrageous conduct." *Id.* Other hallmarks of extreme and outrageous conduct that we have identified previously, like abusing a position of authority over another, *District of Columbia v. Tulin,* 994 A.2d 788, 801 (D.C.2010) (police officer's swearing and insults not outrageous, but causing plaintiff to be arrested and prosecuted "without legal justification" sufficiently outrageous), or callously disregarding another's known weakness, *Drejza, supra,* 650 A.2d at 1312–13 (plaintiff was a rape victim who accused the defendant detective of derogatory and belittling comments during her interview), are also not present in this case.

To be sure, the protests were loud and disturbing. However, our case law requires more to support a claim of "extreme and outrageous conduct." Because the threshold finding of "extreme and outrageous conduct" is a question of law, *Waldon v. Covington,* 415 A.2d 1070, 1078 (D.C.1980), we are constrained to conclude that the trial court abused its discretion when it concluded that Mr. Paese was likely to succeed in establishing, on this record, "extreme and outrageous conduct" by the defendants.

We reach the same conclusion with respect to the element of "severe emotional distress." Again, our case law sets a high standard, requiring "emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result." *Kotsch v. District of Columbia,* 924 A.2d 1040, 1046 (D.C.2007) (internal quotation marks and citation omitted). "Recovery is not allowed merely because conduct causes mental distress." *Crowley v. North Am. Telecomms. Ass'n,* 691 A.2d 1169, 1172 (D.C.1997). Likewise, " '[e]mbarrassment and difficulty' do not approach the level of foreseeable harm essential to establish [appellants'] intentional tort liability." *Waldon, supra,* 415 A.2d at 1078. A person may "intentionally inflict some worry and concern," so long as he or she "refrain[s] from conduct intended or likely to cause physical illness." *Clark v. Associated Retail Credit Men of Washington D.C.,* 70 App. D.C. 183, 187–88, 105 F.2d 62, 66–67 (1939).

In his declarations and testimony, Mr. Paese clearly alleged some mental distress. However, we are unable to discern any indication that his distress was "of so acute a nature that harmful physical consequences might be not unlikely to result." *Kotsch, supra,* 924 A.2d at 1046 (internal quotation marks and citation omitted). Unlike other intentional infliction of emotional distress plaintiffs, Mr. Paese did not complain of any symptoms of emotional distress, like a loss of sleep or an inability to concentrate. *See Purcell v. Thomas,* 928 A.2d 699, 713–14 (D.C.2007); *Homan, supra,* 711 A.2d at 821; *Clark, supra,* 105 F.2d at 65 (collecting cases, where plaintiffs variously were "nervous and could not work," or suffered "worry, humiliation, and

loss of sleep"). Instead, Mr. Paese only labeled the emotions he was feeling, without indicating "the intensity and the duration of the distress," which are factors "to be considered in determining its severity." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j. We have also previously found a list of emotions similar to the one presented by Mr. Paese to be insufficient to establish "severe emotional distress." *See Wood, supra,* 979 A.2d at 78 (plaintiff who was "horrified" at the "destruction of her garden"; "constantly crying and almost sleepless"; "shaken"; and "embarrassed at having been made out to be a 'pariah' in the neighborhood" denied recovery because the distress was insufficiently severe). Therefore, we conclude that the trial court's finding of a likelihood of success on this prong of the intentional infliction of emotional distress claim was not supported by the record. In short, Mr. Paese is not entitled to an injunction on his intentional infliction of emotional distress claim because he has not "clearly demonstrated" a "substantial likelihood" of success on two of the three elements of the tort. *Feaster, supra,* 832 A.2d at 1287.

### Substantial Likelihood of Success on the Appellees' Claim of Private Nuisance

 Before the trial court, Mr. Ortberg and Mr. Weber argued that the District of Columbia does not recognize "private nuisance" as a stand-alone tort, but rather as a theory of damages requiring the commission of a predicate tort. The trial court rejected their argument, relying on this court's opinion in *B & W Management, Inc. v. Tasea Inv. Co.,* 451 A.2d 879 (D.C.1982), and determined that private nuisance was a tort which required proof of "a substantial and unreasonable interference [with the] private use and enjoyment of one's land." On appeal, Mr. Ortberg and Mr. Weber contend that the trial court committed legal error, and assessed the claim brought by Goldman Sachs and Mr. Paese under the improper standard.

Our past nuisance cases have involved different time periods and factual contexts, and varying legal principles. Consequently some, including our trial judges, may perceive our decisions as perhaps conflicting or hard to decipher.[3] Our more recent

3. In the early time period between 1894 and 1912, and in cases involving different factual scenarios, this court established basic legal principles governing nuisance cases. We adhered to principles articulated in the Supreme Court's decision in *Baltimore & Potomac R.R. Co. v. Fifth Baptist Church,* 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883), a case concerning the negative impact of a railroad's engine house and machine repair shop on the church's ordinary use of its edifice. Because "the cause of the annoyance and discomfort" to the congregation proved to be "continuous," the railroad's "nuisance" was restrained by the court. *Id.* at 329, 2 S.Ct. 719. Our court followed *Fifth Baptist Church* in *Baltimore & Potomac R.R. Co. v. Fitzgerald,* 2 App.D.C. 501 (1894), a case where the railroad company operated, loaded and unloaded, and stored freight cars containing live animals and "noxious substances" on four separate railroad tracks located in front of appellant's family home. The court concluded

that the railroad could not use its property as a storage place or working area if its use "unreasonably interfere[d] with and disturb[ed] the peaceful and comfortable enjoyment of others in their property." *Id.* at 518. The court required proof of "a substantial injury" in *Akers v. Marsh,* 19 App.D.C. 28 (1901) (a case where a homeowner complained about the use of land across the street at night as a croquet field), and the court said that in cases where "the damage is small, [the complainant must show that] the injury is of a *continuous* nature." *Id.* at 43 (emphasis in original).

Between 1912 and 1950, the court considered several issues relating to a private nuisance: (1) whether certain institutions constituted a nuisance *per se* or as operated, *see French v. The Association For Works of Mercy,* 39 App.D.C. 406 (1912) (hospital or asylum), *District of Columbia v. Totten,* 55 App.D.C. 312, 5 F.2d 374 (1925) (workhouse or place of detention for prisoners); (2) what constitutes

case law has been unambiguous in its embrace of the Restatement's definition of "private nuisance," *see B & W Management, supra,* 451 A.2d at 881–82. But, we have also partially adopted the Restatement's "theory of tort liability" approach. That is, we have often written that "[n]uisance is a field of tort liability, rather than a type of tortious conduct." *Fowler, supra,* 497 A.2d at 461 (internal quotation marks and citation omitted). In our en banc decision in *Beretta, supra,* we did not disavow or abandon "the field of tort liability" theory, or precedents which articulated that theory, including *Woodner, supra,* and *Bernstein, supra.* Indeed, we said that to establish a claim of "nuisance," we have required plaintiffs to show an "invasion" of one of "two kinds of interests[, public and private]—by conduct that is tortious *only if it falls into the usual categories of tort liability.*" *Beretta, supra,* 872 A.2d at 646 (quoting RESTATEMENT (SECOND) OF TORTS § 821A cmt. c (1979))

reasonable use of one's property in relation to a neighbor's property, *see Pearce v. Scott,* 58 App.D.C. 257, 29 F.2d 630 (1928) (construction of roadway or embankment to prevent runoff from a neighbor's property); and (3) whether nuisance principles apply to landlord and tenant cases, *see Levy v. Bryce,* 46 A.2d 765 (D.C.1946) (behavior of tenant in a rooming house), *Vaughn v. Neal,* 60 A.2d 234 (D.C. 1948) (refusal of tenant to give landlord a key), and *Reese v. Wells,* 73 A.2d 899 (D.C. 1950) (tenant departed home and left gas stove on). In these cases, the court reaffirmed the definition of nuisance found in *Fifth Baptist Church;* and in *Reese,* we referred to nuisance as "a field of tort liability, and not a single type of tortuous conduct." 73 A.2d at 902 (internal quotation marks and citation omitted). We also reiterated two factors or elements that help to determine the existence of an actionable nuisance: "continuity" or "substantial harm" (requiring "some degree of permanence"), and "continuousness or recurrence of the things, facts or acts which constitute the nuisance deriving from the notion of unreasonable use." *Id.* (internal quotation marks and citation omitted).

Apparently there was a hiatus in meaningful nuisance cases in this jurisdiction between 1950 and 1982, and only a few noteworthy cases were decided in the post 1981 period. *B & W Management, supra,* which involved enclosed garage and surface parking facilities, resorted to the Restatement (Second) of Torts and cases from other jurisdictions for definitions of public and private nuisance, rather than relying on historic precedents in this jurisdiction. *Id.* 451 A.2d at 881–82. The other two cases in the decade of the 1980s followed *B & W Management 's* lead in citing the Restatement definitions of nuisance. *See Carrigan v. Purkhiser,* 466 A.2d 1243 (D.C. 1983) (homeowner complained that neighbor's dogs barked incessantly and emitted an unpleasant smell); *District of Columbia v. Fowler,* 497 A.2d 456 (D.C.1985) (District of Columbia liable for negligently failing to abate an alley nuisance after receiving notice of its existence; nuisance caused structural damage to residential property).

We decided two landlord and tenant cases in the 1990s, and looked to Maryland law for the proposition that "nuisance ordinarily is not a separate tort in itself but a type of damage," we also cited *Totten, supra. Bernstein v. Fernandez,* 649 A.2d 1064, 1072 (D.C. 1991) (internal quotation marks and citation omitted) (leaking and falling ceilings in a ground-floor apartment); *Woodner v. Breeden,* 665 A.2d 929, 934 n. 6 (D.C.1995) *opinion amended on denial of reh'g,* 681 A.2d 1097 (D.C.1996) (rental to condo conversion and tenant complaints about poor housing conditions) (citing *Bernstein* and *Reese, supra* ).

The 2000 decade produced three cases with varying factual contexts: *District of Columbia v. Beretta,* 872 A.2d 633 (D.C.2005) (en banc) (lawsuit by the District against manufacturers of firearms), *Tucci v. District of Columbia,* 956 A.2d 684 (D.C.2008) (residential property owner's lawsuit against District of Columbia relating to trash and vermin); *Wood, supra,* 979 A.2d 64 (case involving residential property owners and the impact of a water proofing project). We relied on nuisance definitions from the Restatement and generally followed our more recent decisions in *B & W Management, Woodner,* and *Bernstein* in *Beretta,* 872 A.2d at 646, and in *Tucci,* 956 A.2d at 696–97. In *Wood,* we cited both later and earlier nuisance decisions from this jurisdiction— *Beretta, Totten, Reese, Levy,* and *Fowler.* 979 A.2d at 78–79.

(quotation marks omitted, emphasis in original). We observed that "[t]he defendants [in *Beretta* ] do not dispute ... that a separate tort of public nuisance is cognizable in the District." *Id.* We did not make a similar explicit statement with respect to private nuisance. Moreover, even in the case of the public nuisance claim in *Beretta*, we declared that: "The question, nevertheless, is whether the District has sufficiently pleaded that cause of action, and the answer depends critically on how prepared we are to loosen the tort from the traditional moorings of duty, proximate causation, foreseeability, and remoteness that have made us reject the plaintiffs' claim of negligence." *Id.* We were "not convinced that the public nuisance cause of action the District allege[d][was] sufficiently distinguishable from its negligence claim to justify a different result." *Id.*

▓▓▓▓ To reiterate, our en banc decision in *Beretta* did not disturb our nuisance precedents decided in the period 1982 to 1995. Under those precedents, "[l]iability for nuisance may rest upon intentional invasion of the plaintiff's interests, or a negligent one, or conduct which is abnormal and out of place in its surroundings, and so falls fairly within the principle of strict liability"; and "[w ]ith *very rare exceptions, there is no liability unless the case can be fitted into one of these familiar categories.*" *Fowler, supra,* 497 A.2d at 461 (internal quotation and citations omitted, emphasis in original). As a result, when a plaintiff has claimed that unintentional conduct resulted in a nuisance, we have required proof of negligence. *See Tucci, supra,* 956 A.2d at 697 ("We therefore must look past the label 'nuisance' to determine whether the neglect which the Tuccis allege provides a basis for finding the District liable for tortious conduct.") Furthermore, an intentional interference only gives rise to

nuisance damages if it is otherwise tortious. We have explained that "[a]s an independent tort, claims of nuisance have indeed not been viewed favorably by this court." *Beretta, supra,* 872 A.2d at 646. Instead, a plaintiff may only recover "on the theory of negligence ... or another theory such as intentional infliction of emotional distress." *Id.* (citations omitted). Indeed, where a plaintiff alleges both nuisance and intentional infliction of emotional distress, we have explained that "nuisance is a type of damage and not a theory of recovery in and of itself," so the elements of a theory of recovery must be established with reference to the elements of "the intentional infliction of emotional distress claim." *Jonathan Woodner Co., supra,* 665 A.2d at 934. *See also Bernstein, supra,* 649 A.2d at 1072–73 (" '[N]uisance ordinarily is not a separate tort in itself but a type of damage,' so that a plaintiff seeking to recover on a nuisance theory must allege and prove some sort of tortious conduct.") (internal citation omitted). Consistent with this approach, we have not permitted the recovery of nuisance damages when a plaintiff's loss is made whole under a different theory of liability. *See Jonathan Woodner Co., supra,* 665 A.2d at 934; *Bernstein, supra,* 649 A.2d at 1073.

▓▓▓ Even assuming, without deciding, that our en banc decision in *Beretta* recognized the possibility of a private nuisance claim as an independent tort rather than as a type of damage, we are persuaded on the record in this case and on the basis of principles articulated in this jurisdiction's earliest nuisance cases, there is a substantial likelihood that Mr. Paese and Goldman Sachs would be unable to prevail on such a claim. In defense of the trial court's approach, Mr. Paese and Goldman Sachs call our attention to one of our most recent cases, suggesting that we have "on occa-

sion recognized an 'actionable private nuisance.'"[4] *Wood, supra,* 979 A.2d at 78.

We did note in *Wood* that "our jurisdiction has on occasion recognized an 'actionable private nuisance.'" *Id.* at 78 (citing *Totten, supra, Reese, supra*). We further stated that: "To be actionable as a nuisance, the offending thing must be marked by 'some degree of permanence' such that the 'continuousness or recurrence of the things, facts, or acts which constitute the nuisance,' give rise to an 'unreasonable use.'" *Id.* (citing *Reese, supra,* 73 A.2d at 902). Thus, we actually invoked the "continuity" or "substantial harm" and the "continuousness or recurrence" factors articulated in *Reese,* and first appearing in *Fifth Baptist Church, supra,* 108 U.S. at 329, 2 S.Ct. 719.

Application of the factors set forth above to the record in this case prompts us to conclude, as we indicated earlier in this opinion, that Mr. Paese was disturbed in the enjoyment of his property on only a few occasions over several weeks; there were only five demonstrations at his home, none of which lasted more than thirty minutes. The same is true with respect to Goldman Sachs' office where there were eight demonstrations. The most serious demonstration involved a tense encounter between the protestors and Mr. Paese's neighbors. Moreover, the record shows that neither Mr. Paese nor Goldman Sachs suffered "substantial harm" flowing from "some degree of permanence" with regard to the protestors' actions. The court highlighted these factors in yet another early case, *Akers, supra,* where it said: "the complainant, before he can ask for relief by injunction, must prove that he has sustained such a substantial injury by the acts of the defendant, as would have entitled him to a verdict in an action at law." 19 App.D.C. at 43 (citations omitted). We also declared in *Akers* "that even though the damage is small, indeed merely nominal, yet if the injury is of a *continuous* nature, so as to operate as a constantly recurring grievance, the court will restrain it, to avoid a multiplicity of actions." *Id.* On this record, then, even assuming that we recognize a private nuisance as an independent tort, we cannot conclude that there is a substantial likelihood that Mr. Paese and Goldman Sachs can prevail on their nuisance claim.[5] That is, we cannot

4. We are mindful that a host of tortious conduct was alleged in the *Wood* litigation, much of which could have served as the basis for a finding of nuisance damages under the field of liability theory. *Wood, supra,* 979 A.2d at 70 ("[T]he Neumans filed a civil suit seeking compensatory and punitive damages for assault and battery, breach of privacy, stalking and harassment, vandalism and trespass, libel, and nuisance.") We also recognize that the nuisance issue was essentially moot, because the jury had declined to award any damages on that claim. *Id.* at 79.

5. In his concurring/dissenting opinion, Judge McLeese concludes "that the better reading [of this court's past nuisance] decisions is that private nuisance exists as an independent tort under District of Columbia law." [Page 170] His conclusion, contrasted with that of the majority, underscores our view that the issue, whether private nuisance is recognized as an independent tort in the District of Columbia, must be resolved by the en banc court, not by a three-judge panel's attempt to craft a coherent answer out of decisions dating from 1894 to 2009. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). Judge McLeese acknowledges that, "[a]lthough the courts in this jurisdiction have ... repeatedly held that private nuisance is an independent tort, language in some of our cases appears to have created confusion on the matter." [Page 171] Moreover, his interpretation of our en banc decision in *Beretta, supra,* does not afford him a clear path to this court's definitive recognition of an independent private nuisance tort. He asserts that, "[b]ecause *Beretta* did not overrule our prior cases holding that private nuisance is an independent tort, those cases are binding on us in deciding the present case." [p. 174] Nevertheless, Judge McLeese

say that the protestors' behavior resulted in a substantial injury or continuous or constantly recurring acts that constituted "an unreasonable interference" with Mr. Paese's or Goldman Sachs' use of their property.[6]

Accordingly, for the foregoing reasons, we are constrained to reverse the trial court's grant of a preliminary injunction, and we remand the case to the trial court for further proceedings.

*So ordered.*

Opinion for the court by Senior Judge REID.

Opinion concurring in part and dissenting in part by Associate Judge McLEESE at page 169.

McLEESE, Associate Judge, concurring in part and dissenting in part:

The court reverses a preliminary injunction that substantially restricts the ability of appellants Adam Ortberg and Michael Weber to conduct animal-rights protests near the offices of appellee Goldman Sachs Group, Inc. (Goldman) and the homes of current or former Goldman employees, specifically including appellee Michael

Paese. In reversing, the court concludes that Goldman and Mr. Paese failed to establish a substantial likelihood of success on the merits of their claims that the conduct of Mr. Ortberg and Mr. Weber during prior protests constituted either the tort of private nuisance or the tort of intentional infliction of emotional distress. Rather than reversing the preliminary injunction outright and in its entirety, I would (1) uphold the trial court's conclusion that Mr. Paese demonstrated a substantial likelihood of success on the merits of a claim of private nuisance with respect to Mr. Paese's home; (2) reverse the injunction outright to the extent it imposes restrictions relating to Goldman's offices; (3) vacate the remainder of the injunction as overbroad under the First Amendment; and (4) remand the case for further proceedings. I therefore respectfully concur in the judgment in part and dissent in part.

I.

The opinion for the court in this case appears to conclude that the tort claims raised by Goldman and Mr. Paese are all "barred by law," at least on the current factual record.[1] Ante at 162–63. I would

states, as he must, that "[t]here is one post-*Beretta* case that arguably points in the opposite direction," *Tucci, supra;* and he attempts to clear the path or brush aside *Tucci* by trying to distinguish or explain that decision. [Page 174] Significantly, in our view, both the majority and the concurring/dissenting opinions point the way to en banc resolution of the independent tort issue, rather than its resolution by a three-judge panel.

6. Because we are reversing the trial court's order issuing the preliminary injunction in this case, we do not address the parties' arguments regarding the scope of the injunction and the extent to which it may conflict with appellants' First Amendment rights. Since any injunction must be tailored to suit the wrongs it seeks to redress, we decline to offer an opinion on the nature of an appropriate

injunction that could be issued in the event that either Goldman Sachs or Mr. Paese prevails on a claim.

1. The court's opinion suggests that in assessing whether Goldman and Mr. Paese established a substantial likelihood of success on the merits, this court is obliged to determine de novo whether the underlying tort claims lack legal merit. Ante at 162–63. I do not view this court's cases as clear on that point. *Compare, e.g., In re Reilly,* 933 A.2d 830, 837 (D.C.2007), *with, e.g., Zirkle v. District of Columbia,* 830 A.2d 1250, 1256 n. 5 (D.C.2003) (general rule is that this court, when reviewing trial-court order respecting preliminary injunction, does not "resolve the overall merits"; under "narrow exception," when trial court's action turns on question of law, reviewing court *"may* reach the merits of the

reach a contrary conclusion as to the claim of private nuisance with respect to Mr. Paese's home, and would uphold the trial court's conclusion that Mr. Paese had established a substantial likelihood of success on that claim. On the other hand, I would conclude that Goldman and Mr. Paese failed to make an adequate showing as to the likelihood of success with respect to a claim of private nuisance at Goldman's office.

## A.

The opinion for the court discusses at length this court's decisions addressing private nuisance. Ante at 165–69. In its discussion, the court acknowledges that those decisions could be viewed "as perhaps conflicting or hard to decipher," and suggests that private nuisance may not be an independent tort under those decisions. Ante at 165, 167. Although I share the court's view that our decisions addressing the tort of private nuisance are far from clear, I would conclude that the better reading of those decisions is that private nuisance exists as an independent tort under District of Columbia law.

Appellate courts in this jurisdiction have repeatedly recognized private nuisance as an independent tort. *See, e.g., Baltimore & Potomac R.R. v. Fitzgerald,* 2 App.D.C. 501 (1894); *Akers v. Marsh,* 19 App.D.C. 28 (1901); *District of Columbia v. Totten,* 55 App.D.C. 312, 5 F.2d 374 (1925); *Levy v. Bryce,* 46 A.2d 765 (D.C.1946); *Carrigan v. Purkhiser,* 466 A.2d 1243 (D.C.

1983).[2] In 1883, the Supreme Court of the United States affirmed a judgment awarding damages against a defendant railroad, concluding that the operation of an engine house adjacent to a church in the District of Columbia was "a nuisance in every sense of the term" because it "interfered with the enjoyment of property" and "annoy[ed] and disturb[ed] one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable." *Baltimore & Potomac R.R. v. Fifth Baptist Church,* 108 U.S. 317, 329, 2 S.Ct. 719, 27 L.Ed. 739 (1883) (further stating that "[f]or such annoyance and discomfort the courts of law will afford redress by giving damages against the wrong-doer, and when the cause of the annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance"). The Court of Appeals of the District of Columbia subsequently adopted the holding of *Fifth Baptist* in deciding appeals involving similar nuisance claims against the same railroad company. *Fitzgerald,* 2 App.D.C. at 516–17, 1894 WL 11893, at *10 (affirming judgment of damages for nuisance); *Johnson v. Baltimore & Potomac R.R.,* 4 App.D.C. 491, 500–05, 1894 WL 11900, at *5–7 (1894) (concluding that appellant was entitled to damages for nuisance, but was not entitled to injunction).

In another early case, *Totten,* 5 F.2d 374, the Court of Appeals of the District of Columbia affirmed a damages award for nuisance against the District of Columbia arising out of the District's establishment

---

controversy" (quoting *Don't Tear It Down, Inc. v. District of Columbia,* 395 A.2d 388, 391 (D.C.1978))) (emphasis added); *cf. Walter E. Lynch & Co. v. Fuisz,* 862 A.2d 929, 932–33 (D.C.2004) (in granting emergency stay, court finds legal question raised to be "serious," but otherwise "offer[ed] no opinion on its merits"). For current purposes, however, I assume that it is appropriate for this court to

determine de novo the question whether the tort claims advanced by Goldman and Mr. Paese fail as a matter of law on the current record.

2. Decisions of the United States Court of Appeals for the District of Columbia Circuit issued before February 1, 1971, are binding on this court. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

of a poorly run temporary prison near the plaintiff's home. The *Totten* court reiterated the Supreme Court's definition of "actionable nuisance" as "that which renders the ordinary use and occupation by a person of his property uncomfortable to him." *Id.* at 380 (citing *Fifth Baptist*). *Totten* further noted that plaintiff's case "[did] not rest upon the theory of negligence on the part of the officers of the District of Columbia, but upon the commission of a nuisance by them," and explained that "[a] nuisance may not, necessarily, grow out of acts of negligence, but may be the result of skillfully directed efforts—efforts which may be skillfully directed towards accomplishing the desired end, but which may not have due regard for the rights of others." *Id.* at 379.

In *Carrigan,* this court reversed the trial court's dismissal of plaintiff's suit for private nuisance based on the odor and noise caused by a neighbor's dogs. 466 A.2d at 1243–45. The court concluded that the trial court had misapplied the law by relying on concepts relevant to the tort of trespass, explaining that "since appellant's claim was for a private nuisance, the trial court should have considered the extent to which the smell and noise of appellee's dogs interfered with appellant's reasonable use and enjoyment of her own land...." *Id.* at 1244. The court also determined that the trial court erred by requiring the plaintiff to prove that her damages were "attributable to the negligence or unlawful behavior of the defendant," noting that "[t]o the extent that the barking and odor of appellee's dogs interfered with appellant's use and enjoyment of her home and backyard, appellant suffered an injury." *Id.* Finally, the court concluded that the trial court "erroneously applied the 'special damage' test which gives a private party standing to bring an action for a public nuisance," which "has no place in an action

seeking damages for, or equitable relief from, a private nuisance." *Id.* at 1244–45.

Although the courts in this jurisdiction have thus repeatedly held that private nuisance is an independent tort, language in some of our cases appears to have created confusion on the matter. *See Reese v. Wells,* 73 A.2d 899 (D.C.1950); *District of Columbia v. Fowler,* 497 A.2d 456 (D.C. 1985); *Bernstein v. Fernandez,* 649 A.2d 1064 (D.C.1991); *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929 (D.C.1995), *amended,* 681 A.2d 1097 (D.C.1996). Those cases do not, however, establish the proposition that private nuisance is not an independent tort. In *Reese,* the court held that a single instance of leaving premises while a gas stove was lit did not amount to a nuisance. 73 A.2d at 902. The court did remark that nuisance is a "field of tort liability" rather than a "single type of tortious conduct." *Id.* (internal quotation marks omitted). That remark, however, means only that there are different kinds of nuisance, not that private nuisance is not an independent tort.

In *Fowler,* the court held that the District of Columbia was properly found liable in private nuisance on the theory that inadequate maintenance of a public alley had damaged an adjacent private residence. 497 A.2d at 458–63. The court did conclude that the District of Columbia could be found liable only upon a showing of some kind of negligence, *id.* at 462, but that conclusion was explicitly context-specific. *Id.* The court emphasized that the District of Columbia had not "created the nuisance" at issue. *Id.* at 460. In that circumstance, the court explained, proof of negligence was required to establish liability, because none of the other potential bases of nuisance liability were applicable. *Id.* at 462 & n. 11; *id.* at 461 ("[L]iability for nuisance may rest upon intentional invasion of the plaintiff's interests *or* a negli-

gent one, *or* conduct which is abnormal and out of place in its surroundings, and so falls fairly within the principle of strict liability.") (emphasis added; brackets in original). *Fowler* thus does not hold that private nuisance generally can be established only if the elements of some other tort are made out. Rather, *Fowler* illustrates that an action for private nuisance in some circumstances may rest on negligence, but in other circumstances may rest on strict-liability doctrines or on the principle imposing liability upon those who intentionally and unreasonably interfere with others' use and enjoyment of their land. Put differently, although private nuisance sometimes overlaps with other tort doctrines, an action for private nuisance can lie in circumstances in which no other tort doctrine provides a basis for liability. It is in that sense that private nuisance is an independent tort.

*Fowler* does contain language that, considered in isolation, could be read to suggest that private nuisance is not properly viewed as an independent tort. *See id.* at 461 ("Nuisance, in short, is not a separate tort in itself, subject to rules of its own.") (internal quotation marks omitted), 461 n. 8 ("some 'tortious conduct' such as negligence is a necessary component of virtually all nuisance claims"). Read as a whole, however, *Fowler* is consistent rather than inconsistent with prior binding holdings that a tort of nuisance can be made out through, inter alia, proof of intentional conduct that unreasonably interferes with a landowner's use and enjoyment of property.

Finally, *Bernstein* and *Woodner* both involve the unusual setting of nuisance actions brought by tenants against their landlords. *Bernstein,* 649 A.2d at 1072–73 (adopting Maryland law barring nuisance claims by tenants against landlords and requiring that such claims be raised under

theory of negligence; explaining that there is "no reason to expand the scope of District of Columbia landlord-tenant law by importing into it the 'impenetrable jungle' of the law of nuisance"); *Woodner,* 665 A.2d at 934 (applying holding of *Bernstein* "in this context," i.e., suit by tenant against landlord and property manager). Again, there is broader language in both cases that, considered in isolation, could be read to suggest that private nuisance is generally not an independent tort. *Bernstein,* 649 A.2d at 1072–73 (District of Columbia law is "consistent" with Maryland law that "nuisance *ordinarily* is not a separate tort in itself but a type of damage") (emphasis added; internal quotation marks omitted); *Woodner,* 665 A.2d at 934 ("nuisance is a type of damage and not a theory of recovery in and of itself"). That language, however, must be read in light of the holdings of the two cases and the holdings of the prior cases in this jurisdiction.

Even if these more recent cases could not be reconciled with the earlier cases holding that private nuisance is an independent tort, however, the more recent cases could not supersede the holdings of the earlier ones, which govern unless overruled en banc. *Thomas v. United States,* 731 A.2d 415, 420–21 & n. 6 (D.C.1999) ("The rule is fundamental in our jurisprudence that no division of this court will overrule a prior decision of this court.... Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.") (internal quotation marks omitted).

Thus, as of the time of this court's en banc decision in *District of Columbia v. Beretta,* 872 A.2d 633 (D.C.2005), the law of this jurisdiction was that private nuisance was an independent tort. As an en banc decision, *Beretta* could have over-

turned that principle, but it did not do so. *Beretta* involved a tort action brought by the District of Columbia against gun manufacturers. *Id.* at 637. In pertinent part, the court held that the facts alleged by the District of Columbia did not support a valid claim of public nuisance. *Id.* at 646–51. In reaching that conclusion, the court neither explicitly nor implicitly overruled its prior decisions establishing private nuisance as an independent tort.

First, *Beretta* considered and rejected a claim of public nuisance, not private nuisance. 872 A.2d at 646. Although *Beretta* noted that the distinction between public nuisance and private nuisance is immaterial in some contexts, *id.,* critical distinctions between the two doctrines remain. For example, public nuisance can involve a broad array of harms, in contrast to the much narrower focus of private nuisance. *See B & W Mgmt., Inc. v. Tasea Inv. Co.,* 451 A.2d 879, 881–82 (D.C.1982) (defining "public nuisance" as "unreasonable interference with a right common to the general public," including interference with "public health, safety, morals, peace, or convenience"; defining "private nuisance" as "substantial and unreasonable interference with private use and enjoyment of one's land"). The public-nuisance claim at issue in *Beretta* rested on the theory that the distribution of guns by gun manufacturers unduly interfered with public health, safety, and peace. *Beretta,* 872 A.2d at 639. *Beretta*'s analysis of the limitations of public nuisance in that context has little relevance to more conventional private-nuisance claims involving interference with the private use and enjoyment of one's land.

Second, *Beretta*'s discussion of the limits of nuisance law is far from unequivocal. For example, although the court said that claims of nuisance framed as an indepen-

dent tort have "not been viewed favorably by this court," 872 A.2d at 646, the court did not say that such claims are foreclosed. And although *Beretta* noted *Woodner*'s statement that "nuisance is a type of damage and not a theory of recovery," the court in *Beretta* did not adopt or endorse that statement. *Id.* Other statements in *Beretta* are ambiguous at best. For example, *Beretta* cited to the definition of "nuisance" in the *Restatement (Second) of Torts:* "the invasion of two kinds of interests ... by conduct that is tortious only if it falls into the usual categories of tort liability." 872 A.2d at 646. But this language in the *Restatement* simply reflects the decision of the authors of the *Restatement* not to use the unadorned word "nuisance" to refer to a specific tort, but instead to use more precise phrases, such as "private nuisance" and "public nuisance," to refer to specific torts. *Restatement (Second) of Torts* § 821A cmt. c (1979). That terminological choice cannot properly be read as a substantive determination that private nuisance is not an independent tort. To the contrary, the substantive provisions of the *Restatement* unambiguously treat private nuisance as an independent tort, in the sense that private nuisance as defined in the *Restatement* does not necessarily require proof of the elements of some other tort such as negligence or intentional infliction of emotional distress, and instead can be established through proof of an intentional and unreasonable interference with the use and enjoyment of land. *Restatement (Second) of Torts* §§ 821D cmts. b & c, 822(a) (1979).

*Beretta* also stated that the question whether the plaintiff before it had stated a claim of public nuisance "depends critically on how prepared we are to loosen the tort from the traditional moorings of duty, proximate causation, foreseeability, and remoteness." 872 A.2d at 646. This passage does not suggest that public nuisance

(much less private nuisance) can be shown only through proof of all of the elements of some other tort. Rather, the passage simply suggests that, in determining the scope of public nuisance, particularly in the novel setting the court was confronting in *Beretta*, the court thought it appropriate to consider, and not lightly stray too far from, general principles of tort liability. *Beretta* also noted—but did not endorse— the argument that this court has "never recognized a public nuisance claim that did not involve *either* ownership (and control of) real property, criminal violations, *or* independently tortious conduct such as negligence." 872 A.2d at 646 (emphasis added). The claim of private nuisance at issue in this case, however, does involve alleged interference with the use and enjoyment of real property. Such a claim would be foreclosed only if *Beretta* had both accepted such an argument and extended it to private nuisance.

Third, *Beretta* explicitly accepts for the purpose of its analysis that public nuisance is cognizable as a separate tort. 872 A.2d at 646. It would be quite peculiar to read *Beretta* as implicitly rejecting what it expressly assumed, and in so doing *sub silentio* overruling this court's prior decisions identifying private nuisance as an independent tort with elements that do not necessarily include proving another form of tort liability. *See generally Lee v. United States*, 668 A.2d 822, 828 (D.C.1995) ("This court will not lightly deem one of its decisions to have been implicitly overruled and thus stripped of its precedential authority."); *Satcher v. Pruett*, 126 F.3d 561, 575 (4th Cir.1997) (rejecting contention that Supreme Court decision "implicitly decided ... the very question it explicitly left open").

Because *Beretta* did not overrule our prior cases holding that private nuisance is an independent tort, those cases are bind-ing on us in deciding the present case. For the same reason, we are bound by *Wood v. Neuman,* 979 A.2d 64, 78–79 (D.C. 2009) (holding post-*Beretta* that nuisance exists as independent tort under District of Columbia law). *See also Kreuzer v. George Washington Univ.,* 896 A.2d 238, 248 (D.C.2006) (private nuisance "requires proof of an interference with the interest in the private use and enjoyment of the land") (internal quotation marks omitted). There is one post-*Beretta* case that arguably points in the opposite direction. *See Tucci v. District of Columbia,* 956 A.2d 684, 696–97 & n. 12 (D.C.2008) (in context of suit against District of Columbia for failure to clean up litter, court states that nuisance is not independent tort and must "be based on some underlying tortious conduct, such as negligence"; court declined to consider theory, raised for first time on appeal, that District of Columbia could be held liable in private nuisance on ground that it "intentionally interfered with the use and enjoyment of [plaintiffs'] land"). The nuisance at issue in *Tucci* was not created by the District of Columbia, but rather arose from the District's alleged failure to maintain a right-of-way and to enforce anti-littering ordinances. *Id.* at 696, 698. *Tucci* is thus much like *Fowler,* 497 A.2d at 458–63, which also involved a suit against the District of Columbia for a nuisance that the District had not created. Like *Fowler, Tucci* can reasonably be understood to be limited to that context. More fundamentally, for the previously stated reasons, *Tucci* cannot properly be viewed as superseding the holdings of prior cases that private nuisance is an independent tort.

Thus, to the extent that the court in this case suggests that private nuisance is not an independent tort under the law of the District of Columbia, I would conclude otherwise. I also note that the overwhelming weight of authority supports the conclusion

that private nuisance is properly understood as an independent tort. *See, e.g., Restatement (Second) of Torts* §§ 821D cmts. b & c, 822(a) (1979);[3] 7 S. Speiser, C. Krause, & A. Gans, *The American Law of Torts*, §§ 20:6 to 20:8 (2011); 1 F. Harper, F. James, Jr., & O. Gray, *Harper, James & Gray on Torts*, §§ 1.23–1.30, at 90–91 (3d ed. 2006) ("The recognition of nuisance as a tort goes back at least to the thirteenth century...."); 2 D. Dobbs, P. Hayden, & E. Bublick, *The Law of Torts* §§ 399–402 (2d ed.2011); 58 *Am.Jur.2d Nuisances* §§ 1, 4–7, 23–24, 33, at 571 (2012) (" 'nuisance' has been defined as a distinct civil wrong"); 66 *C.J.S. Nuisances* §§ 1–2, 9 (2009). *See also, e.g., Wietzke v. Chesapeake Conference Ass'n*, 421 Md. 355, 26 A.3d 931, 941–42 (2011); *Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 887 (Minn.2010) (distinguishing between nuisance and negligence); *Gevelaar v. Millennium Inorganic Chems.*, No.2012–A–0013, 2013 WL 501745, at *3 (Ohio Ct.App. Feb. 8, 2013) ("In Ohio, the term 'nuisance' designates a distinct tort ....") (internal quotation marks omitted); *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 254 Wis.2d 77, 646 N.W.2d 777, 793 n. 22 (2002) ("We emphasize that negligence and nuisance are distinct torts, and that negligence is just one way (as opposed to intentional) that a nuisance can be maintained.").

## B.

I would further hold that the trial court did not abuse its discretion by concluding that Mr. Paese had demonstrated a substantial likelihood of prevailing on his claim of private nuisance at his home.

## 1.

In support of his claim of private nuisance at his home, Mr. Paese proffered the following. Beginning in September 2010, animal-rights protestors affiliated with a group called Defenders of Animal Rights Today and Tomorrow (DARTT), including appellants Adam Ortberg and Michael Weber, targeted Mr. Paese's home. Protests occurred at the home on September 4, September 18, October 23, October 30, and October 31. At the protests, two of which occurred after dark, a group ranging from four to eight protestors assembled in an alley running alongside the home. Members of the group then chanted through a bullhorn continuously, for approximately thirty minutes. The protests were so loud that one of Mr. Paese's neighbors, who described the decibel level as "intolerable" and "maddening," wore protective earphones comparable to those worn at firing ranges. That neighbor, who also described the protests as "loud" and "aggressive," was afraid to entertain guests and found it impossible to enjoy her home during the protests. During one protest, another neighbor shut himself and his dogs in a back room, trying to get relief from the noise, but still found the protest frightening, loud, and intrusive. Protestors also placed bullhorns directly into the ears of Mr. Paese's neighbors,

3. As this court has explained, "[W]e ought not to assume too readily that our decisions should be construed in a way that makes them inconsistent with the Restatement, which is written by the American Law Institute (ALI), an organization compris[ing] ... especially distinguished judges, attorneys, and scholars. The Restatement may be regarded both as the product of expert opinion and as the expression of the law by the legal profession. Although we are not required to follow the Restatement, we should generally do so where we are not bound by the previous decisions of this court or by legislative enactment, ... for by so doing uniformity of decision will be more nearly effected." *District of Columbia v. Tulin*, 994 A.2d 788, 797 n. 10 (D.C. 2010) (citations, internal quotation marks, and original brackets omitted).

causing them pain. One neighbor felt trapped inside his home during the protests and was afraid to leave.

During the protests, some of the protestors wore masks or kerchiefs to conceal their identities, which Mr. Paese and his neighbors found very intimidating. The protestors chanted slogans accusing Mr. Paese of torturing and killing animals. The protestors also chanted, "Mr. Paese, we know where you sleep," and "For the animals we will fight, we know where you sleep at night." During one protest, a protestor told one of Mr. Paese's neighbors, "[I]f you think we're bad, wait till you see who will come to the protests in the future." The protestors also shouted, "we'll be back," and promised to return on Thanksgiving and Christmas.

Protestors blocked the car of one Mr. Paese's neighbors, and blocked other neighbors as they tried to pass by. A protestor also placed a sign in the face of one Mr. Paese's neighbors. Arguments and pushing matches erupted between protestors and Mr. Paese's neighbors, and the police were called on at least one occasion. Goldman eventually posted a security guard outside Mr. Paese's home.

Several people videotaped the protests. Videos of the protests later appeared on YouTube, and were available through links at the website of a group based in the United Kingdom called Stop Huntingdon Animal Cruelty (SHAC). In one of the videos, a protestor at Mr. Paese's home indicates that the protest is in solidarity with protestors from the U.K., and graphics and voiceovers on the video indicate that the protest was in solidarity with protesters from SHAC. SHAC's website listed DARTT as a "local SHAC advocacy group," and there was a link from SHAC's website to DARTT's website. SHAC's website also reported on the protests at Mr. Paese's home, albeit with a disclaimer asserting that DARTT was an independent group that did not conduct or incite illegal activity. Members of SHAC have been criminally convicted, both in the U.K. and the United States, in connection with a number of violent animal-rights protests.

Mr. Paese felt "targeted and terrorized" by the protests at his home. Goldman advised him to stay away from his home for his personal safety during times when protests were expected to occur.

### 2.

The court appears to conclude that the information proffered by Mr. Paese was insufficient as a matter of law to support a claim of private nuisance at Mr. Paese's home. Ante at 168–69. I would conclude otherwise. As the court notes, a claim of private nuisance cannot rest on an interference with the enjoyment of land that is insubstantial or fleeting, but rather must rest on a harm that is "substantial." *See, e.g., Reese*, 73 A.2d at 901–02 (single instance of leaving residence with gas stove lit did not amount to private nuisance; suggesting, without holding, that "some degree of permanence . . . [,] continuousness or recurrence" is required) (internal quotation marks omitted); *cf., e.g., Restatement (Second) Torts*, § 821F, cmt. g (1979) ("Significant harm is necessary for a private nuisance . . . and continuance or recurrence of the interference is often necessary to make the harm significant. . . . The decisions do not, however, support a categoric requirement of continuance or recurrence in all cases as an established rule of law.").

Unlike *Reese*, this case does not involve a single or isolated incident. Rather, when the trial court initially issued a temporary restraining order in November 2010, there had already been five protests at Mr. Paese's home in the preceding two months, and protestors had promised that

they would be back, specifically mentioning Thanksgiving and Christmas. Nor can the alleged interference with Mr. Paese's enjoyment of his home be viewed as so insubstantial as to fail as a matter of law. To the contrary, the information proffered by Mr. Paese would surely permit a reasonable jury to find that the demonstrations were so loud and frightening as to constitute a substantial interference with Mr. Paese's enjoyment of his home. As the Supreme Court has put it, "The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt...." *Frisby v. Schultz,* 487 U.S. 474, 486, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). *See also, e.g., Yates v. Kemp,* 979 N.E.2d 678, 683 (Ind.Ct.App.2012) ("Noise may be a nuisance if it is unreasonable in degree, and reasonableness is a question of fact."); *St. John's Church in Wilderness v. Scott,* 194 P.3d 475, 478–80 (Colo.App.2008) (claim of private nuisance adequately supported by evidence of demonstrations on street and sidewalk that unreasonably interfered with church services). *Cf. Wood,* 979 A.2d at 70, 72, 78 (trial court properly declined to dismiss claim of private nuisance where plaintiff claimed that defendant neighbor placed signs in window disparaging plaintiff, trained cats to use plaintiff's garden as litter box, threw wine in plaintiff's window, left debris in plaintiff's yard, and sprayed plaintiff with water from hose); *Carrigan,* 466 A.2d at 1243–45 (trial court erred in granting judgment to defendant in case where plaintiff alleged that private nuisance was caused by incessant barking and smell from neighbor's dogs).

It generally is a jury question whether the harms claimed by a plaintiff are sufficiently substantial to support a claim of private nuisance. *See, e.g., Ka v. City of Indianapolis,* 954 N.E.2d 974, 981 (Ind.Ct. App.2011) (determination whether challenged conduct creates sufficiently grave

interference as to constitute nuisance "is ... made by the trier of fact in light of all of the surrounding facts and circumstances and, consequently, summary judgment is rarely appropriate in nuisance in fact cases"); 58 *Am.Jur.2d Nuisances* § 194 (2012) ("whether a nuisance has been created and maintained is ordinarily a question of fact"); *cf. Restatement (Second) Torts* § 826, cmt. b (1979) ("Fundamentally, the unreasonableness of intentional invasions is a problem of relative values to be determined by the trier of fact in each case in light of all of the circumstances of that case."). In light of the allegations in this case, I do not believe that it would be appropriate to take away from the jury a claim of private nuisance at Mr. Paese's home. I therefore respectfully disagree with the court's contrary conclusion. Nor do I see any other basis for concluding that the trial court abused its discretion in determining that Mr. Paese established a substantial likelihood of prevailing on the claim that the protests significantly interfered with Mr. Paese's use and enjoyment of his home.

### 3.

Mr. Ortberg and Mr. Weber argue that, as a matter of law, a claim of private nuisance can be brought only against an adjacent property owner. Although this court does not appear to have decided the question, the weight of modern authority appears to be to the contrary. *See, e.g., Ugrin v. Town of Cheshire,* 307 Conn. 364, 54 A.3d 532, 539–40 (2012); *Kaplan v. Prolife Action League,* 111 N.C.App. 1, 431 S.E.2d 828, 838–39 (1993) ("the fact that a defendant stands upon property other than his own does not preclude a claim for private nuisance") (citing other courts and commentators); *Restatement (Second) Torts* § 822 cmt. c (1979) ("An invasion of a person's interest in the private use and

enjoyment of land by *any type* of liability-forming conduct is private nuisance.") (emphasis added). *Cf., e.g., St. John's Church,* 194 P.3d at 478–80 (claim of private nuisance adequately supported by evidence of demonstrations on street and sidewalk that unreasonably interfered with church services); *Huntingdon Life Sciences v. Stop Huntingdon Animal Cruelty,* 27 A.D.3d 420, 811 N.Y.S.2d 109, 110 (2006) (upholding trial court's refusal to dismiss private nuisance action predicated on residential picketing). Mr. Weber and Mr. Ortberg have provided no persuasive reason why this court should depart from that approach, and I see none.[4] I therefore would uphold the trial court's conclusion that Mr. Paese demonstrated a substantial likelihood of success on a claim that Mr. Ortberg and Mr. Weber created a private nuisance at Mr. Paese's home.[5]

## C.

On the other hand, I do not believe that Goldman and Mr. Paese demonstrated a substantial likelihood of success on the claim of private nuisance at Goldman's office.

The complaint alleges that the activities of the demonstrators "substantially and intentionally interfered with plaintiffs' use and enjoyment" of Goldman's office. The evidence proffered in support of that allegation, however, was scant. Most of the evidence involves the effects of the demonstrations on individuals who are not identified as employees of Goldman. To establish a claim of private nuisance, however, Goldman and Mr. Paese were required to demonstrate a substantial interference with *their* use and enjoyment of property, not with the use and enjoyment of property by others. *See generally, e.g., Totten,* 5 F.2d at 380 (defining "actionable nuisance" as "that which renders the ordinary use and occupation by a person of his property uncomfortable *to him*") (emphasis added). There was very little evidence of how the demonstrations at the building in which Goldman's offices are located affected Mr. Paese or other Goldman employees. Mr. Paese indicated that he could not hear the protests from his office, and that he was not aware of any Goldman employee who was unable to enter the building. One Goldman employee attested that protesters "harassed and screamed at Goldman

---

4. Mr. Ortberg and Mr. Weber rely on *Daily v. Exxon Corp.,* 930 F.Supp. 1 (D.D.C.1996), but the precise holding of that case does not assist them. The district court in *Daily,* applying District of Columbia law, concluded that an owner of real property could not bring a nuisance action against Exxon based on leaks from gasoline tanks leased from Exxon and kept on the owner's property. *Id.* at 2 (relying on *Rosenblatt v. Exxon,* 335 Md. 58, 642 A.2d 180 (1994) (subsequent occupant of land cannot bring nuisance action against prior occupant of land)). Although *Daily* expresses the broader view that, under Maryland law, "to be actionable as between private persons, a nuisance must originate from a neighbor's property," 930 F.Supp. at 2, neither *Daily*'s understanding of Maryland law nor Maryland law itself is binding on this court. It is true that this court gives "great weight" to the law of Maryland on undecided questions of common law. *McClintic v. McClintic,* 39 A.3d 1274, 1279 n. 2 (D.C.2012). Nevertheless, even if it were settled under Maryland law that a property owner cannot recover in nuisance against someone who is not an adjacent property owner but whose conduct substantially interferes with the property owner's enjoyment of the property, I would follow the contrary approach reflected in the *Restatement* and supported by the weight of modern authority.

5. Because I would conclude that the trial court did not abuse its discretion in determining that Mr. Paese demonstrated a substantial likelihood of success on his claim of private nuisance at his home, I do not address Mr. Paese's alternative claim that the activities of the protestors at his home constituted intentional infliction of emotional distress.

employees and others as they tr[ied] to enter the building," but did not indicate how often that had occurred. Mr. Paese attested that he had been told by another Goldman employee about a single incident in which that employee had been accosted and had to "push her way through" demonstrators. A Goldman employee attested that demonstrators entered "the lobby of the building and sounded an airhorn or yelled through a bullhorn, creating a disturbance to Goldman and the other tenants in the building. . . ." Again, however, there was no concrete description of the nature of the alleged disturbance to Goldman or its employees. Finally, there was a description of a single incident in which the building was placed in lockdown temporarily because of a loud noise made by a protestor that frightened a tenant, who called the police.

In granting the preliminary injunction, the trial court expressed concerns about "interruption of business activity," "effect[s] on [Goldman's] ability to do business," and the "willingness of [Goldman's] employees to come to work." There was very little evidence, however, that the demonstrations actually had any such effects on Goldman or its employees. Although the question whether a plaintiff has demonstrated a substantial interference rising to the level of private nuisance is typically a question for the jury, the issue is appropriately resolved by the court if no reasonable fact-finder could find for the plaintiff on the issue. *See, e.g., Reese*, 73 A.2d at 901–02 (finding evidence of private nuisance insufficient as matter of law); 58

*Am.Jur.2d Nuisances* § 194 (2012) (whether nuisance exists is not question for jury if "reasonable minds cannot differ on the matter"). Goldman and Mr. Paese cite no authority supporting a conclusion that a claim of private nuisance can rest on such minimal evidence as has been proffered thus far in this case with respect to Goldman's office. On this point I am in accord with the conclusion of the court that there was inadequate support for a conclusion that Goldman and Mr. Paese demonstrated a substantial likelihood of success on a claim of private nuisance at Goldman's office. Ante at 168–69. I therefore concur in the court's decision to reverse the preliminary injunction outright as it relates to Goldman's offices.

## II.

Given its conclusion that Goldman and Mr. Paese failed to show a substantial likelihood of success on the merits of their underlying tort claims, the court appropriately declines to address the other arguments raised by Mr. Ortberg and Mr. Weber, including the argument that the preliminary injunction issued in this case must be reversed on First Amendment grounds. Ante at 168–69 n. 5. On my view of the case, the court would need to address those arguments, some of which seem to me quite challenging. I see little point, however, to a lengthy separate opinion analyzing difficult constitutional arguments that are not being addressed or decided by the court and that may well be of no relevance to the further disposition of this case.[6] *Cf. Hudson v. Flood*, 94 A.

---

**6.** In reversing the preliminary injunction in this case, the court appears to hold that the information presented so far by Goldman and Mr. Paese fails as a matter of law to support the claimed torts. Ante at 168–69. That holding does not necessarily foreclose the possibility that Goldman and Mr. Paese could obtain permanent relief. *See, e.g., Johnson v.*

*Capital City Mortg. Corp.*, 723 A.2d 852, 856–57 (D.C.1999) (declining to give res judicata effect to ruling denying preliminary injunction). But the court's holding does make it somewhat speculative whether the trial court will ultimately have any need to address First Amendment issues. Moreover, Mr. Ortberg and Mr. Weber have stated that they no long-

760, 766 (Del.1915) (Boyce J., dissenting) ("A fuller discussion of the questions raised in this case is unnecessary in a dissenting opinion."). I therefore provide only a very brief summary of the way in which I would have resolved the remaining issues in this appeal.

Given the proffered evidence that the prior protests substantially and unreasonably interfered with Mr. Paese's use and enjoyment of his home, I do not believe that the First Amendment completely forecloses the possibility of a lawful injunction regarding Mr. Paese's home. *See generally, e.g., Madsen v. Women's Health Ctr.,* 512 U.S. 753, 774–75, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (upholding injunction imposing noise restrictions on residential picketing; striking down 300–foot buffer zone as overbroad and inadequately justified; "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result"); *Frisby,* 487 U.S. at 484, 108 S.Ct. 2495 (ordinance prohibiting residential picketing was not facially invalid under First Amendment; noting that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society" (quoting *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980))).

Nevertheless, as Goldman and Mr. Paese acknowledge, the injunction at issue in this case burdens interests protected by the First Amendment, and therefore may be upheld by this court only if "the challenged provisions of the injunction burden no more speech than is necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516. I would conclude that the injunction is substantially overbroad, and I therefore would vacate the injunction and remand for further proceedings.

For example, as later modified by the trial court, the preliminary injunction prohibits Mr. Ortberg and Mr. Weber, and others acting in concert with them, from "gathering, protesting and/or demonstrating" within specified distances of any property in the District of Columbia that is owned or leased by Mr. Paese; any other current or former Goldman employee, officer, or director; or any family member of a current or former Goldman employee, officer, or director. That prohibition is quite sweeping in several respects: it does not explicitly require any knowledge or intent on the part of Mr. Ortberg or Mr. Weber; it is not limited to protests or demonstrations, instead reaching broadly to any "gathering"; and it extends not just to Mr. Paese's home but also to all properties belonging to a potentially large group of people some of whom have very tenuous connections to Goldman (such as family members of former employees). In my view, neither the evidence presented to the trial court nor the specific findings of the trial court provide an adequate basis for so sweeping a restriction. *Cf., e.g., United States v. Alaw,* 356 U.S.App.D.C. 80, 80–84, 327 F.3d 1217, 1217–21 (2003) (striking

er intend to protest at Goldman's offices or Mr. Paese's home, because the connection they perceived between animal-rights issues and Goldman and Mr. Paese no longer exists. Although the court determined by unpublished order that voluntary cessation of protesting activity by Mr. Ortberg and Mr. Weber did not render this appeal moot, the alleged change in circumstances is potentially relevant to the merits of the question whether it would be appropriate to grant permanent injunctive relief. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 924 n. 67, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("Since the boycott has apparently ended, the Mississippi Supreme Court may wish to vacate the entire injunction on the ground that it is no longer necessary....").

down injunction as overbroad because it could be construed to prohibit appellant from inadvertently walking within 20 feet of facility where abortions are performed).

To take a second example, the preliminary injunction prohibits Mr. Ortberg and Mr. Weber, and others acting in concert with them, from "communicating to any person in any manner, directly or indirectly, the names ... [of] any current or former Goldman ... employee, officer or director, including but not limited to [Mr. Paese]...." By its terms, the injunction therefore precludes Mr. Ortberg and Mr. Weber from mentioning Mr. Paese's name. Moreover, the injunction is not limited to intentional or knowing conduct, so that Mr. Ortberg and Mr. Weber would apparently violate the injunction simply by uttering the name of a person who, unbeknownst to them, was a former Goldman employee.

As a final example, under the preliminary injunction as modified Mr. Ortberg and Mr. Weber, and others acting in concert with them, may not "publish[ ] or deliver[ ] by website, electronic-mail or in any form whatsoever any information concerning or describing any activities perpetrated by any person affiliated with [them] against [Goldman and Mr. Paese], to the extent such publication or delivery discloses the addresses [of] ... or other identifying information concerning any current or former Goldman [ ] employee...." Read literally, the injunction would apparently preclude Mr. Ortberg and Mr. Weber from communicating by e-mail with their lawyers about this case, at least to the extent such e-mails identified the location of the protests or the name of the target employee.

Although Mr. Ortberg and Mr. Weber challenge the injunction as overbroad in numerous other respects, the foregoing examples more than suffice for current purposes to establish that the preliminary injunction entered in this case was not "precis[e] and narrowly tailored to achieve the pin-pointed objective of the needs of the case." *Tory v. Cochran*, 544 U.S. 734, 738, 125 S.Ct. 2108, 161 L.Ed.2d 1042 (2005) (internal quotation marks omitted; brackets in original). I therefore would vacate the injunction and remand for further proceedings. *See generally, e.g., Female Health Care Ctrs. v. Mills*, 419 Mich. 948, 357 N.W.2d 642, 642 (1984) (after finding temporary restraining order overbroad, court vacated order and remanded for further proceedings to determine whether preliminary injunction should issue, based on "specific findings of fact which will support the issuance of an injunction ... based upon the proper standards to be applied").

In sum, (1) I agree with the court that the preliminary injunction must be reversed outright to the extent the injunction relates to Goldman's offices; (2) I would uphold the trial court's determination that Mr. Paese demonstrated a substantial likelihood of success on the merits of his claim of private nuisance at his home; and (3) I would vacate the remainder of the injunction as overbroad under the First Amendment, and remand for further proceedings. I therefore respectfully concur in the judgment in part and dissent in part.